IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MARCO PUENTE, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-cv-1329 |
| | § | |
| BLAKE SHIMANEK, and | § | |
| ANKIT TOMER, | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Marco Puente, complaining of Blake Shimanek and Ankit Tomer, and for causes of action will respectfully show unto the Court as follows:

## SUMMARY

On August 15, 2020, Marco Puente was illegally arrested and pepper sprayed in retaliation for standing across the street on the sidewalk and filming the police interaction between his son and Officer Blake Shimanek of the Keller Police Department, as Officer Shimanek racially profiled Mr. Puente's Hispanic son in what would be a failed attempt to find narcotics following a traffic stop and eventual arrest for making a wide right turn.

As Mr. Puente stood silently recording the interaction on his cell phone from a distance, Office Shimanek directed his subordinate, Officer Ankit Tomer, to arrest Mr. Puente, despite not having probable cause that Mr. Puente had committed any crime.

As Officer Tomer approached Mr. Puente, Mr. Puente attempted to speak to Officer Tomer regarding Officer Shimanek's order to arrest him. Mr. Puente did not resist Officer Tomer, but simply questioned why he was being arrested as Officer Tomer grabbed his right wrist.

Officer Shimanek then approached and used excessive force against Mr. Puente by grabbing his other arm, attempting to knock his phone to the ground which Mr. Puente had been using to film Officer Shimanek, placing Mr. Puente in a headlock, pulling Mr. Puente to the ground, getting on top of Mr. Puente, and then ordering Officer Tomer to spray Mr. Puente in the face and eyes with OC spray, which Officer Tomer did, twice.

After assaulting and handcuffing Mr. Puente, Officers Shimanek and Tomer refused to wipe away the OC spray from Mr. Puente's face and eyes, despite the obvious pain Mr. Puente was experiencing. In what can only be described as cruel and inhumane conduct intended to prolong Mr. Puente's pain, Officer Shimanek refused to provide Officer Tomer with a towel for Mr. Puente when Officer Tomer asked for one, simply responding "not to give him." Officer Shimanek then directed Officer Tomer not to wait for medics for Mr. Puente, but instead to transport him to the jail, further delaying medical treatment and allowing the OC spray to continue burning his eyes and face.

Upon review of the videos and reports in this case, Lieutenant Craig Berry, Captain Tracy Talkington, and Chief of Police Brad Fortune realized that the uses of force and arrest of Mr. Puente were inappropriate. They immediately had Mr. Puente released from jail and his charges dropped. Two days later, Captain Talkington and Chief of Police Fortune met with Mr. Puente to apologize for their officers' conduct and to reiterate that Officers Shimanek and Tomer were in the wrong, not Mr. Puente.

Mr. Puente now files this lawsuit against Officers Shimanek and Tomer for violating his constitutional rights under the First, Fourth and Fourteenth Amendments to the United States Constitution to be free from retaliatory arrest for recording officers, to be free from arrests without probable cause, to be free from excessive force, and to receive adequate medical care.

## I.
## PARTIES

1.      Plaintiff Marco Puente is a resident of Keller, Texas.

2.      Defendant Blake Shimanek is an individual residing in Keller, Tarrant County, Texas and is a police officer with the City of Keller Police Department and may be served at his place of employment at the Keller Police Department located at 330 Rufe Snow Dr., Keller, TX 76248 or wherever he may be found. Defendant Shimanek is being sued in his individual capacity.

3.      Defendant Antik Tomer is an individual residing in Keller, Tarrant County, Texas and is a police officer with the City of Keller Police Department and may be served at his place of employment at the Keller Police Department located at 330 Rufe Snow Dr., Keller, TX 76248 or wherever he may be found. Defendant Tomer is being sued in his individual capacity.

## II.
## JURISDICTION AND VENUE

4.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

5.      Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants reside in the Northern District of Texas and all of the causes of action accrued in the Northern District of Texas.

## III.
## FACTS AND ALLEGATIONS

6.      On August 15, 2020, Plaintiff Marco Puente had his constitutional rights violated when Defendant Officers Blake Shimanek and Ankit Tomer of the Keller Police Department unlawfully arrested Mr. Puente and used excessive force against him.

7.     Following the illegal arrest and use of excessive force, Defendants Shimanek and Tomer were deliberately indifferent to Mr. Puente's clear and obvious medical needs.

8.     At all times relevant to this lawsuit, Defendants Shimanek and Tomer were acting under color of law.

9.     The interaction between Mr. Puente and Defendants Shimanek and Tomer was recorded by multiple body cameras, dash cameras, a cell phone cameras.[1]

10.     On August 15, 2020, Mr. Puente was meeting his twenty-two-year-old son, Dillon, at his wife's grandfather's house so that Mr. Puente could take his son to get the air conditioner in his car fixed.

11.     As Dillon was pulling into his great grandfather's neighborhood, Defendant Shimanek pulled him over for making a wide right turn, which Defendant Shimanek claims happened before his dash camera video began recording.

12.     It will become apparent that Defendant Shimanek was racially profiling Dillon, a Hispanic male, for what Defendant Shimanek believed would be a narcotics crime when he conducted the traffic stop on Dillon; however, it would later be determined that Dillon was not in possession of narcotics after Defendant Shimanek arrested Dillon for making a wide right turn and then searched his car, finding nothing illegal.

13.     As Defendant Shimanek approached the vehicle, Dillon rolled his window up around ¾ of the way so that he could safely speak to the officer and provide his identification.

14.     Defendant Shimanek ordered Dillon to roll his window down.

---

[1] Defendant Shimanek's body worn camera video is attached as Exhibit A and fully incorporated herein. Defendant Shimanek's dash camera video is attached as Exhibit B and fully incorporated herein. Defendant Tomer's body worn camera video is attached as Exhibit C and fully incorporated herein. Defendant Tomer's dash camera video is attached as Exhibit D and fully incorporated herein. Officer Austin Hinkle's body worn camera video is attached as Exhibit E and fully incorporated herein.

15.     Dillon immediately complied by rolling his window all of the way down.

16.     Defendant Shimanek immediately became hostile toward Dillon and ordered him out of the vehicle.

17.     Dillon complied with Defendant Shimanek's order and exited his vehicle with both of his hands raised above his head.

18.     Defendant Shimanek immediately ordered Dillon to turn around and place his hands behind his back.

19.     Dillon immediately complied by turning around and placing his hands behind his back.

20.     Defendant Shimanek then placed Dillon in handcuffs behind Dillon's back.

21.     Defendant Shimanek asked Dillon why he was acting so suspicious even though Dillon was not acting suspicious as he had complied with all of Defendant Shimanek's orders and answered all of Defendant Shimanek's questions.

22.     Dillon responded to Defendant Shimanek that he was scared.

23.     Defendant Shimanek then began to berate Dillon for rolling his window up ¾ of the way.

24.     At this time, Plaintiff Marco Puente (hereinafter referred to as "Mr. Puente") drove up in his truck.

25.     Mr. Puente placed his truck in park within inches of the curb on his side of the road, which would be a legal place to park his vehicle without blocking the roadway.



26.     The photograph above is a screenshot from Defendant Shimenak's dash camera video, which shows that Mr. Puente's truck, which is indicated with a red arrow, was legally parked near the curb on the side of the road in the neighborhood.

27.     Mr. Puente was clearly and obviously not parked in the middle of the roadway and it not even arguable that he was.

28.     Mr. Puente's vehicle was not blocking the roadway as it was on the side of the road only inches from the curb, with ample space for pedestrian or vehicular traffic to pass by without issue, making it so that the roadway was not rendered impassable or passage unreasonably inconvenient or hazardous.

29.     Mr. Puente asked what was going on and immediately began filming the interaction between Defendant Shimanek and his son with his cell phone.

30.     Defendant Shimanek told Mr. Puente to "take off."

31.     Mr. Puente responded, "no sir," as he was legally parked in his vehicle across the street, was not blocking the roadway, and was monitoring the interaction between his son and Defendant Shimanek from a safe distance.

32.     Mr. Puente was not violating any laws by sitting in his vehicle, legally parked, and filming police interaction from across the street.

33.     Dillon told Defendant Shimanek that Mr. Puente was his father.

34.     Defendant Shimanek moved Dillon to the rear of his vehicle.

35.     Defendant Shimanek then told Mr. Puente, "you're about to be arrested for blocking the roadway if you don't park and get out."

36.     Mr. Puente asked in an attempt to clarify, "park and get out?"

37.     Defendant Shimanek stated, "park over there, you are interfering with my job, you need to go park over there."

38.     Mr. Puente responded, "I'm not interfering with anything, I'm just recording you" and complied by reversing his truck to park in front of his wife's grandfather's house.

39.     At no time did Mr. Puente get out of his truck during that interaction.

40.     After Defendant Shimanek directed him to park and exit his vehicle, Mr. Puente parked and exited his vehicle.

41.     As Mr. Puente went to park his vehicle, Defendant Shimanek patted Dillon down and asked him, "why on earth are you acting like this?"

42.     However, Dillon was not acting inappropriately and had done nothing to warrant being placed in handcuffs and berated following a traffic stop for making a wide right turn.

43.     Throughout the interaction it became abundantly clear that Defendant Shimanek was racially profiling Dillon in a clear attempt to find narcotics after using a traffic violation as his reason for making the pretextual stop.

44.     Dillon would later be arrested and taken to jail for the traffic violation of making a wide right turn for the sole purpose of Defendant Shimanek searching his vehicle for narcotics, which he would not find.

45.     Defendant Shimanek even told Lt. Berry at the scene that, "I'm quite certain there's narcotics in the car, so I think I'm going to arrest him for the wide right turn."

46.     After moving his truck as he was directed to do, Mr. Puente walked back down the sidewalk as he continued to film the interaction between his son and Defendant Shimanek.

47.     Mr. Puente did not leave the sidewalk to enter the street, did not approach in a rapid or aggressive manner, and did not even say anything to Dillon or Defendant Shimanek while he was filming from the sidewalk.



48.     The photograph above is a screen shot from Defendant Shimanek's dash camera video. The red arrow indicates where Mr. Puente again legally parked his truck in front of his wife's grandfather's house after being directed to do so by Defendant Shimanek. The blue arrow indicates where Mr. Puente was walking back toward the scene on the sidewalk on the other side of the street from where his son and Defendant Shimanek were standing.

49.     Defendant Officer Antik Tomer then arrived on scene and exited his vehicle as Mr. Puente was filming from across the street.



50.     The photograph above is a screenshot from Defendant Shimanek's dash camera video, which shows the scene at the moment that Defendant Tomer arrived. The red arrow identifies Mr. Puente, who was standing stationary and silent on the sidewalk across the street filming on his cell phone.

51.     As Defendant Tomer was walking up to the scene, Defendant Shimanek told Defendant Tomer, "watch him" and pointed toward Mr. Puente who was standing

stationary on the sidewalk across the street, silent, and filming the police interaction with his son on his cell phone.

52.     In response, Mr. Puente asked, "watch me what, watch me stand here?"

53.     Defendant Shimanek responded, "yep."

54.     Defendant Shimanek then told Defendant Tomer, "better yet, arrest him" and pointed toward Mr. Puente.

55.     Mr. Puente asked, "for what?"

56.     Defendant Shimanek responded, "blocking the roadway."

57.     However, Mr. Puente had clearly not been blocking any roadway, as he was currently standing on the sidewalk and when he had previously been in his vehicle, he was legally parked within inches of the curb so that traffic would not be impeded before complying with Defendant Shimanek's order to park and exit his vehicle.

58.     Neither Defendant Shimanek nor Defendant Tomer had probable cause that Mr. Puente had committed a crime at the time that Defendant Shimanek directed Defendant Tomer to arrest Mr. Puente, as Mr. Puente had not been obstructing the roadway, had complied with the order to move his truck, and was simply filming the police interaction in silence from the pubic sidewalk across the street.

59.     Defendant Tomer approached Mr. Puente to arrest him as he was directed by Defendant Shimanek.

60.     As Defendant Shimanek lacked probable cause to arrest Mr. Puente, it is clear that Defendant Shimanek directed Defendant Tomer to arrest Mr. Puente in retaliation for Mr. Puente filming Defendant Shimanek during his racially motivated interaction with Dillon.

61.     As Defendant Tomer approached him, Mr. Puente attempted to speak to Defendant Tomer regarding why he was being arrested for "blocking a roadway."

62.     Defendant Tomer then began to place handcuffs on Mr. Puente.

63.     Mr. Puente did not resist Defendant Tomer's illegal arrest and allowed Defendant Tomer to place the handcuffs on him.



64.     The photograph above is a screenshot from Defendant Shimanek's body worn camera, which shows Mr. Puente standing stationary while Defendant Tomer was placing the handcuffs onto his left wrist.

65.     Mr. Puente was recording the illegal arrest on his cell phone which he was holding in his right hand.

66.     Defendant Shimanek then approached Mr. Puente, grabbed his right arm and pulled it as he attempted to knock the phone out of Mr. Puente's hand, which Mr. Puente had been using to film Defendant Shimanek.

67.     Defendant Shimanek gave no warning and attempted no negotiation before grabbing and forcefully pulling Mr. Puente's arm and attempting to knock the phone from his hand.

68.     Defendant Shimanek then placed Mr. Puente in a head lock, pulled Mr. Puente to the ground by his right arm, and jumped on top of Mr. Puente.



69.     The above photograph is a screenshot from Defendant Tomer's body worn camera video which shows Defendant Shimanek placing Mr. Puente into a headlock.

70.     As Defendant Shimanek was on top of Mr. Puente and Mr. Puente was asking "what are you doing," Defendant Tomer grabbed the back of Mr. Puente's head and held a can of OC spray directly in front of Mr. Puente's eyes.

71.     Defendant Tomer told Mr. Puente, "you're going to get sprayed."

72.     Mr. Puente responded, "I'm not doing anything" as he laid on the ground with Defendant Shimanek on top of him.

73.      Defendant Shimanek said, "spray him" even though Mr. Puente had not committed a crime, threatened anyone, been aggressive toward anyone, or resisted arrest prior to Defendant Shimanek using greater force than necessary to make the illegal arrest.

74.      Defendant Tomer then began spraying Mr. Puente in the face and eyes with OC spray from only a few inches away from his face and eyes.



75.      The photograph above is a screenshot from Defendant Tomer's body worn camera video which shows Defendant Tomer spraying Mr. Puente in the eyes from only a couple inches away and Mr. Puente attempting to shield his eyes from the excessive use of force.

76.      Mr. Puente stated, "what the heck?"

77.      Defendant Shimanek lifted Mr. Puente's sunglass from his eyes.

78.      Defendant Tomer then sprayed Mr. Puente for a second time in his face and eyes from only a few inches away.



79.     The photograph above is a screenshot from Defendant Tomer's body worn camera video which shows Defendant Tomer spraying Mr. Puente in the eyes a second time with OC spray from only a few inches away from his face.

80.     Defendant Shimanek then handcuffed Mr. Puente.

### Defendant Shimanek's Arrest of Mr. Puente was in Retaliation for Filming Defendant Shimanek's Racially Motivated Traffic Investigation

81.     A white male approached the officers as they were assaulting Mr. Puente.

82.     Defendant Shimanek told the witness twice to stay away.

83.     The witness did not leave.

84.     Defendant Tomer told the witness twice to stay away.

85.     The witness did not leave.

86.     The witness defiantly stated, "I'll stay right here."

87.     Defendant Shimanek told the witness to back off.

88.     Defendant Tomer told the witness to stay away.

89.     The witness responded, "I'm not going anywhere."

90.     The witness stated, "that was horseshit, you guys have issues."

91.     Defendant Shimanek told the witness to move back to the corner.

92.     The witness responded, "I'm 25 feet back, I'm fine" and continued to refuse to back away as ordered.

93.     The witness continued to refuse to move and stated, "what are you guys nuts - he did nothing."

94.     Despite the witness failing to comply with both Defendants Shimanek's and Tomer's seven different orders to back away, neither Defendant Shimanek nor Defendant Tomer arrested the witness for any crime.

95.     This is noteworthy as Defendant Shimanek claimed he was directing Defendant Tomer to arrest Mr. Puente for "blocking a roadway," despite the fact that Mr. Puente was not obstructing a roadway and complied with the order to move his truck. However, when the white male that approached refused to comply with orders to move from the sidewalk he was obstructing and defiantly talked back to the officers, neither officer arrested him, let alone threatened to arrest him.

96.     It is apparent that Keller Police officers do not routinely arrest individuals who have been alleged to obstruct a passageway; however, this is precisely what Defendant Shimanek told Defendant Tomer to arrest Mr. Puente for when Mr. Puente was simply standing on the sidewalk silently filming the police interaction between his son and Defendant Shimanek.

97.     This arrest was retaliation for Mr. Puente filming Defendant Shimanek and was a violation of Mr. Puente's First Amendment rights to film the police.

## Defendant Shimanek Lied to Officers in an Attempt
## to Gain Support for His Illegal Conduct

98.     Following the illegal and retaliatory arrest and excessive use of force against Mr. Puente, Defendant Shimanak began telling a fabricated version of events to fellow officers and supervisors in an attempt to gain support for his illegal conduct.

99.     These lies by Defendant Shimanek support that the truth did not justify the actions of either Defendant Shimanek or Defendant Tomer.

100.    Defendant Shimanek lied several times to Officer Hope when he told Officer Hope that:

    a. Dillon was "acting extremely nervous."

    b. Dillon was "acting nervous as can be."

    c. Mr. Puente was "cruising down the road and stops in the middle of the road."

    d. Mr. Puente was "feeding son, telling him what to do."

    e. Mr. Puente "walks up into my scene multiple times, I said you're done you're under arrest."

101.    Defendant Shimanek's body camera video proves that Dillon was not "acting extremely nervous" or "acting nervous as can be."

102.    Defendant Shimanek's dash camera video proves that Mr. Puente at no time stopped in "the middle of the road."

103.    Defendant Shimanek's dash camera video proves that Mr. Puente at no time was ""feeding son, telling him what to do."

104.    Defendant Shimanek's dash camera video proves that Mr. Puente at no time "walke[d] up into [Defendant Shimanek's] scene," let alone "multiple times."

105.    These were flat out lies, which Defendant Shimanek made in an effort to rally support for his atrocious conduct.

106.    Thankfully, the body camera and dash camera footage memorialized the true events on this day, or Mr. Puente would be trapped attempting to gain justice with only Defendant Shimanek's lies as evidence of what occurred.

107.    Interestingly, one of the only true statements Defendant Shimanek made to Officer Hope actually supports the fact that Mr. Puente complied with the order to move his truck, as Defendant Shimanek told Officer Hope, "I said sir if you don't leave you are going to be detained for blocking the roadway, so then he proceeds to back up all the way and parks over there."

108.    Later, Defendant Shimanek lied to Lieutenant Craig Berry when he stated the following:

    a.  Dillon started "acting squirrely and reaching around."

    b.  Mr. Puente "starts yelling at me, I can't even talk to the son."

    c.  Mr. Puente "walks all the way back up here and was interfering."

109.    Defendant Shimanek's body camera video and dash camera video prove that none of these statements were true.

110.    After hearing these lies, Lieutenant Berry gave Defendant Shimanek permission to arrest Dillon so that a search of the car could be conducted due to Defendant Shimanek informing Lieutenant Berry he believed narcotics would be found.

111.    Defendant Shimanek had no objective evidence to support his belief that narcotics would be found in Dillon's vehicle, other than Dillon was a young Hispanic male.

112.    After a search of Dillon's vehicle, no narcotics were found.

113.    While sitting in the back of the patrol vehicle, Dillon told Defendant Shimanek "that's messed up what you did to my dad," which demonstrates that Dillon observed the excessive use of force and illegal arrest and understood it to be wrong when it happened.

114.    In response, and in an apparent attempt to justify his illegal actions, Defendant Shimanek stated, "your dad cannot legally stop in the middle of the road and he cannot walk into the middle of something I'm doing OK?"

115.    However, at no time did Mr. Puente "stop in the middle of the road."

116.    Additionally, at no time did Mr. Puente "walk into the middle of something Defendant Shimanek was doing."

117.    Defendant Shimanek told Officer Hope regarding Mr. Puente, "he literally stopped in the road, no curb line or nothing."

118.    However, Mr. Puente stopped only inches from the curb, not in the middle of the roadway, which is easily seen on Defendant Shimanek's dash camera video.

## DELIBERATE INDIFFERENCE

119.    Following the excessive use of force against Mr. Puente, he informed Defendants Shimanek and Tomer he was in need of medical attention.

120.    Mr. Puente immediately began to complain that his eyes were on fire from the OC spray.

121.    Defendant Shimanek responded, "we will get you medics in just a second," which along with the facts that Defendant Shimanek directed Defendant Tomer to spray Mr. Puente with OC spray and he was present when Defendant Tomer sprayed Mr. Puente with the OC spray, indicates that Defendant Shimanek was aware that Mr. Puente was in need of immediate medical care for the burning pain in his eyes and on his face.

122.     Mr. Puente asked Defendants Shimanek and Tomer for a towel or something to wipe his burning eyes.

123.     Defendant Tomer then requested medics over the radio, which along with the fact that Defendant Tomer sprayed Mr. Puente with the OC spray, indicates that Defendant Tomer was aware that Mr. Puente was in need of immediate medical care.

124.     Mr. Puente again asked Defendants Shimanek and Tomer for a towel to wipe his burning eyes as they walked to Defendant Tomer's patrol vehicle.

125.     While Defendant Tomer was placing Mr. Puente into his patrol vehicle, Mr. Puente again asked for a towel to wipe his burning eyes.

126.     Defendant Tomer responded to Mr. Puente, "it's going to be burning," which indicated Defendant Tomer was aware of Mr. Puente's pain and acknowledged it was occurring.

127.     Mr. Puente again asked for a towel to wipe his burning eyes.

128.     Defendant Tomer responded "we're going to get you a towel" indicating he understood Mr. Puente's request and had acknowledge it.

129.     Mr. Puente again asked for a towel to wipe his burning eyes.

130.     Defendant Tomer stood outside of the patrol vehicle attempting to put gloves on as Mr. Puente screamed out in pain for a towel to wipe his burning eyes because he could not see.

131.     Defendant Tomer asked Defendant Shimanek for a towel.

132.     Defendant Shimanek replied, "not to give him."

133.     Mr. Puente screamed out from the car that he needed a towel because he could not see, and this was heard by both Defendants Shimanek and Tomer as it can be

heard on Defendant Tomer's body worn camera video as he is standing next to Defendant Shimanek.

134.    When Defendant Shimanek refused to give Defendant Tomer a towel for Mr. Puente, Defendant Shimanek was aware that Mr. Puente had been sprayed in the eyes and face with OC spray, that it was causing him pain due the burning nature of the spray, and that wiping the spray from his eyes would alleviate the pain.

135.    Defendant Shimanek told Defendant Tomer to take Mr. Puente to the jail and to wait to provide medical attention until getting there.

136.    Defendant Shimanek was aware of the pain Mr. Puente was suffering as a result of the OC spray due to Defendant Shimanek getting OC spray on his own skin.

137.    Defendant Shimanek requested a towel from Officer Austin Hinkle so that he could wipe the OC spray off his own face due to the burning – which is exactly what he denied Mr. Puente, who Defendant Shimanek new actually had OC spray in his eyes.



138.   The above photograph is a screenshot from Officer Hinkle's body worn camera video which shows Defendant Shimanek using a towel to wipe the OC spray from his burning face, after Defendant Shimanek refused to give a towel to Defendant Tomer to wipe the OC spray off Mr. Puente's burning eyes and face.



139.   The above photograph is a screenshot from Officer Hinkle's body worn camera video which shows Defendant Shimanek pouring water onto the OC spray on his burning arm, after Defendant Shimanek refused to give a towel to Defendant Tomer to wipe the OC spray off Mr. Puente's burning eyes and face.

140.   Defendant Shimanek also made several statements after the incident to other officers that he had OC spray on his skin indicating it was burning and irritating him.

141.   Defendant Shimanek told the jail staff that "I'm on fire" regarding the OC spray that was on him, which he had wiped off with a towel and poured water on already.

142.    Thus, when Defendant Shimanek denied Mr. Puente a towel and directed Defendant Tomer to take Mr. Puente to the jail delaying medical attention, Defendant Shimanek did so knowing the pain Mr. Puente was suffering, knowing the steps necessary to alleviate that pain, to wit: wiping with a towel and pouring water on it, and knowing that Mr. Puente was incapable of doing these things for himself due to being restrained with his arms behind his back in the handcuffs Defendant Sheminak has applied to him.

143.    After Defendant Shimanek directed Defendant Tomer to take Mr. Puente to the jail before providing medical attention, Defendant Tomer returned to the patrol vehicle and began searching Mr. Puente's pockets.

144.    Mr. Puente asked again for a towel in an obvious state of distress.

145.    Mr. Puente asked Defendant Tomer to use Mr. Puente's shirt to wipe his burning eyes; however, Defendant Tomer continued to do nothing for the suffering Mr. Puente.

146.    Defendant Tomer got into his patrol vehicle to take Mr. Puente to the jail, without providing any type of medical assistance or even attempting to wipe the burning OC spray from his eyes.

147.    While in the car, Mr. Puente continued to plead with Defendant Tomer for help.

148.    Mr. Puente stated, "I'm asking for medical assistance, I can't even breathe" loud enough for Defendant Tomer to hear as they were only feet away from each other inside of the patrol car.

149.    Defendant Tomer did not respond to Mr. Puente, instead calling over the radio he needed medics at the jail, which demonstrates that Defendant Tomer was aware

of the need for medical care yet had refused to provide any type of care – even wiping Mr. Puente's face with his shirt.

150.    Mr. Puente continued pleading with Defendant Tomer for a towel.

151.    Defendant Tomer continued to refuse to provide medical assistance for Mr. Puente's burning eyes.

152.    On the way to the jail, Defendant Tomer stopped his patrol vehicle, exited the vehicle, and opened Mr. Puente's door.

153.    Mr. Puente begged Defendant Tomer to wipe his eyes with his shirt.

154.    Stunningly, instead of providing any assistance to the obviously restrained and suffering Mr. Puente, Defendant Tomer continued to refuse to help him.

155.    Defendant Tomer told Mr. Puente, "I know it's burning, I know that."

156.    Defendant Tomer then attempted to adjust Mr. Puente's seatbelt.

157.    Mr. Puente told Defendant Tomer that he could not breathe.

158.    Defendant Tomer responded, "I get it."

159.    Mr. Puente pleaded with Defendant Tomer, stating, "I'm suffocating on my own snot, please wipe it with my own shirt, please."

160.    Defendant Tomer ignored Mr. Puente, clicking his seatbelt in place, and closing the door.

161.    As Defendant Tomer began to drive away for a second time, Mr. Puente continued pleading for help.

162.    Defendant Tomer continued ignoring Mr. Puente.

163.    After pulling into the sally port of the Keller jail, Defendant Tomer exited his patrol vehicle and stood outside of it.

164.    Mr. Puente could be heard yelling for help.

165.    Defendant Tomer did nothing to help.

166.    Defendant Tomer opened his door to turn his car off and could hear Mr. Puente screaming "I'm begging you man, please!"

167.    Defendant Tomer closed the door and walked away.

168.    Another officer asked Defendant Tomer if he needed to get a restraint chair for Mr. Puente, and Defendant Tomer responded that would be a good idea.

169.    There was no reason to place Mr. Puente in a restraint chair as he was simply crying out in pain and begging for help after the use of illegal and excessive force was used against him.

170.    After arriving at the jail, Mr. Puente waited for seven minutes in the backseat of Defendant Tomer's patrol vehicle, pleading for help.

171.    This seven minutes in the back of the patrol vehicle amounted to pure torture as Mr. Puente cried out for help while he was restrained in handcuffs, in the backseat of a police car, after being arrested without having committed a crime and assaulted in front of his son, while his eyes burned from being sprayed multiple times with OC spray, and being unable to breathe due to the mucous running down his nose and throat from the burning spray in his eyes.

172.    The entire time Mr. Puente was calling for help, Defenant Tomer stood outside of the vehicle having casual conversation with other officers.

173.    Once the medics arrived, Mr. Puente was finally given medical attention; however, shockingly it was not provided by the medics, but by an officer at the jail who had been present the entire time Mr. Puente had been suffering and pleading for help in the backseat of the patrol vehicle.

### Chief of Police Brad Fortune Met with Mr. Puente and Stated Defendants Shimanek and Tomer Acted Inappropriately and Mr. Puente's Charged were Dismissed

174.    Two days later, Chief of Police Brad Fortune and Captain Tracy Talkington met with Mr. Puente at his wife's grandfather's home.

175.    Chief Fortune told Mr. Puente that Lieutenant Berry had reviewed the use of force against Mr. Puente.

176.    Chief Fortune told Mr. Puente that Lieutenant Berry believed something was wrong with the use of force, so he notified Captain Talkington, who notified Chief Fortune.

177.    Upon review, Captain Talkington and Chief Fortune had Mr. Puente released from custody the night he was arrested.

178.    Chief Fortune told Mr. Puente that the actions of Defendants Shimanek and Tomer were inappropriate.

179.    Chief Fortune told Mr. Puente his charges were dropped and there would be no charges because it should not have happened.

180.    Chief Fortune apologized to Mr. Puente for the actions of Defendants Shimanek and Tomer.

181.    Mr. Puente told Chief Fortune that he was told to park his truck and get out and that's what he did, to which Chief Fortune agreed with him.

182.    Chief Fortune told Mr. Puente he was released that night and that charges were dropped because it was wrong.

**IV.**
**CAUSES OF ACTION**

**Count One**

**Excessive Force**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Shimanek and Tomer**

183.    Mr. Puente repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

184.    Acting under the color of law, Defendants Shimanek and Tomer deprived Mr. Puente of the rights and privileges secured to him by the Fourth and Fourteenth Amendments to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of force.

185.    Mr. Puente brings this cause of action pursuant to 42 U.S.C. § 1983.

186.    The amount of force used by Defendants Shimanek and Tomer against Mr. Puente as described above, specifically but not limited to, when Defendant Shimanek grabbed and forcibly pulled his arm, attempted to knock his phone to the ground, placed Mr. Puente in a headlock, pulled Mr. Puente to the ground, got on top of Mr. Puente, and then ordered Defendant Tomer to spray Mr. Puente in the face and eyes with OC spray, and when Defendant Tomer sprayed Mr. Puente in the face and eyes with OC spray from only inches away from his face and eyes, twice, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, and suffering upon Plaintiff.

187.    A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

188.   Although officers may need to use "physical force ... to effectuate [a] suspect's compliance" when he refuses to comply with commands during a traffic stop, the officers still must assess "the relationship between the need and the amount of force used." *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012); quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

189.   Where an individual's conduct amounts to mere "passive resistance," use of force is not justified. *Trammell v. Fruge*, 868 F.3d 332, 341 (5th Cir. 2017).

*190.*   A constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest. *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, 731 (5th Cir.)*, cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L. Ed. 2d 23 (2018).

191.   Fifth Circuit case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced. *Id.*

192.   In Texas, the use of force to resist an arrest is justified: (1) if, before the actor offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's use or attempted use of greater force than necessary. Tex. Penal Code Ann. § 9.31.

193.   This means that in Texas, if an officer decides to arrest a person and in doing so uses excessive force to affect that arrest, then the person is justified in offering physical resistance to protect themself from the officer's use of excessive force. Tex. Penal Code Ann. § 9.31.

194.   Defendant Shimanek's use of force by forcibly pulling Mr. Puente's arm and attempting to knock the phone from Mr. Puente's hand was greater force than was

necessary to arrest Mr. Puente, as Mr. Puente was not resisting Defendant Tomer as Defendant Tomer placed handcuffs on Mr. Puente.

195.    Defendant Shimanek's use of force by putting Mr. Puente in a headlock, then pulling Mr. Puente to the ground by his right arm and jumping on top of him was greater force than was necessary to arrest Mr. Puente, as Mr. Puente was not resisting Defendant Tomer as Defendant Tomer placed handcuffs on Mr. Puente.

196.    Defendant Tomer's use of force by spraying Mr. Puente in the face and eyes was greater force than was necessary to arrest Mr. Puente, as Mr. Puente was not resisting but simply attempting to protect himself from the illegal and excessive uses of force by Defendants Shimanek and Tomer.

197.    Mr. Puente was reasonable in his belief that he needed to protect himself against Defendants Shimanek and Tomer's uses of excessive force, and in response, Mr. Puente simply attempted to refrain from being unnecessarily assaulted.

198.    Mr. Puente did not fight the officers, but simply held in a defensive position to protect himself after Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice, despite the fact that Mr. Puente had not committed a crime, threatened anyone, or resisted arrest.

199.    Mr. Puente was not suspected of committing a felony offense when Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice.

200.    Mr. Puente had not even committed a crime, and there was not probable cause to suspect him of committing any crime.

201.    However, at the time that Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice, Defendant Shimanek told Mr. Puente he was under arrest for the minor traffic offense of blocking a roadway.

202.    Mr. Puente was not attempting to flee or evade arrest, as he parked his truck and walked over to the scene for the purpose of filming the interaction between his son and Defendant Shimanek, and when Defendant Tomer began to apply handcuffs, Mr. Puente stood stationary without resisting or moving.

203.    Mr. Puente was not threatening any officer or other person immediately prior to when Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice.

204.    Mr. Puente was not resisting arrest prior to when Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice – as he was allowing Defendant Tomer to apply handcuffs to him when Defendant Shimanek escalated the situation by first using force greater than necessary to affect the illegal arrest.

205.   A reasonable officer would know that these uses of force were <u>clearly</u> <u>excessive</u> when engaging with citizens such as Mr. Puente, who was not threatening any officer or other person, was not suspected of committing any crime and the fictitious crime they were using to arrest him was the minor traffic offense of blocking a roadway (which he had clearly not committed), was not attempting to flee, was not resisting arrest, and who the use of force was not warranted.

206.   A reasonable officer would know that these uses of force is <u>clearly</u> <u>unreasonable</u> when engaging with citizens such as Mr. Puente, who was not threatening any officer or other person, was not suspected of committing any crime and the fictitious crime they were using to arrest him was the minor traffic offense of blocking a roadway (which he had clearly not committed), was not attempting to flee, was not resisting arrest, and who the use of force was not warranted.

207.   A reasonable officer in Defendants Shimanek or Tomer's shoes would know that forcefully pulling a person's arm, attempting to knock the phone out of their hand, putting the person in a headlock, pulling the person to the ground, jumping on top of the person, and spraying the person in the eyes and face with OC spray from only inches away from the person's eyes and face, twice, when that person was not threatening any officer or other person, was not suspected of committing any crime and the fictitious crime they were using to arrest him was the minor traffic offense of blocking a roadway (which he had clearly not committed), was not attempting to flee, was not actively resisting arrest is clearly unreasonable and excessive.

208.   As a direct result of the force used against him by Defendants Shimanek and Tomer, Mr. Puente suffered physical injury, pain and mental anguish.

209.   Defendants Shimanek and Tomer caused Mr. Puente to suffer extreme pain and suffering by burning his eyes and face with OC spray.

210.   Defendant Shimanek caused Mr. Puente to suffer a gash on his nose that bled and has left a permanent scar when Defendant Shimanek forcibly took Mr. Puente to the ground.

211.   These injuries were not caused by any other means.

## Count Two

### Unlawful Arrest
### Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendants Shimanek and Tomer

212.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

213.   No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. 1, 9 (1968).

214.   Defendants Shimanek and Tomer deprived Plaintiff of his constitutionally protected right to be free from unreasonable seizures under the Fourth Amendment by falsely arresting him despite lacking probable that any crime had been committed as he had complied with the orders given to him to park his vehicle and was simply standing in a public place, to wit: a sidewalk, filming the police contact with his son.

215.   There can be no doubt that the right not to be arrested absent probable cause was clearly established at the time of Mr. Puente's arrest. *Alexander v. City of Round Rock*, 854 F.3d 298, 306–07 (5th Cir. 2017).

216.    Fifth Circuit case law also clearly establishes that recording police activity is protected by the First Amendment, subject only to reasonable time, place, and manner restrictions. *Turner v. Lieutenant Driver*, 848 F.3d 678, 688 (5th Cir. 2017); U.S. Const. Amend. 1.

217.    To determine the presence or absence of probable cause, the totality of the circumstances surrounding the arrest must be considered.

218.    Defendants Shimanek and Tomer intentionally arrested Mr. Puente by placing him in handcuffs, without a warrant, without his consent, and without any legal justification.

219.    Mr. Puente did not consent to his confinement and was conscious of it.

220.    Defendants Shimanek and Tomer willfully arrested Plaintiff by telling Plaintiff he was being arrested and by restraining Plaintiff in handcuffs and later in a patrol vehicle.

221.    Mr. Puente did not consent to being restrained in handcuffs or to being restrained in the patrol vehicle.

222.    Defendants Shimanek and Tomer did not have probable cause to support arresting Mr. Puente as they did not see Mr. Puente commit a crime, as he had complied with the orders given to him to park his vehicle and was simply standing in a public place, to wit: a sidewalk, filming the police contact with his son at the time that Defendant Turner and Shimanek placed Mr. Puente under arrest. *Turner*, 848 F.3d at 688; U.S. Const. Amend. 1.

223.    In Texas, the use of force to resist an arrest is justified: (1) if, before the actor offers any resistance, the peace officer uses or attempts to use greater force than necessary to make the arrest or search; and (2) when and to the degree the actor reasonably believes

the force is immediately necessary to protect himself against the peace officer's use or attempted use of greater force than necessary. Tex. Penal Code Ann. § 9.31.

224.    This means that in Texas, if an officer decides to arrest a person and in doing so uses excessive force to affect that arrest, then the person is justified in offering physical resistance to protect themself from the officer's use of excessive force. Tex. Penal Code Ann. § 9.31.

225.    Defendant Shimanek's use of force by forcibly pulling Mr. Puente's arm and attempting to knock the phone from Mr. Puente's hand was greater force than was necessary to arrest Mr. Puente, as Mr. Puente was not resisting Defendant Tomer as Defendant Tomer placed handcuff's on Mr. Puente.

226.    Defendant Shimanek's use of force by putting Mr. Puente in a headlock, then pulling Mr. Puente to the ground by his right arm and jumping on top of him was greater force than was necessary to arrest Mr. Puente, as Mr. Puente was not resisting Defendant Tomer as Defendant Tomer placed handcuff's on Mr. Puente.

227.    Defendant Tomer's use of force by spraying Mr. Puente in the face and eyes was greater force than was necessary to arrest Mr. Puente, as Mr. Puente was not resisting but simply attempting to protect himself from the illegal and excessive uses of force by Defendants Shimanek and Tomer.

228.    Mr. Puente was reasonable in his belief that he needed to protect himself against Defendants Shimanek and Tomer's uses of excessive force, and in response, Mr. Puente simply attempted to refrain from being unnecessarily assaulted.

229.    Mr. Puente did not fight the officers, but simply held in a defensive position to protect himself after Defendant Shimanek forcefully pulled his arm, attempted to knock his phone out of his hand, put him in a headlock, pulled him to the ground, and

jumped on top of him, and Defendant Tomer sprayed him in the eyes and face with OC spray from only inches away from his eyes and face, twice, despite the fact that Mr. Puente had not committed a crime, threatened anyone, or resisted arrest.

230.   Additional factual support that Mr. Puente was illegally arrested is that Mr. Puente was released from jail and his charges were dismissed only hours after his illegal arrest.

231.   Furthermore, Chief of Police Fortune met with Mr. Puente following his illegal arrest and told him that he had done nothing wrong and Defendants Shimanek and Tomer were the ones who had acting wrongly.

232.   Defendants Shimanek and Tomer did not have authority of law to arrest Mr. Puente as they did not have a warrant or probable cause to arrest him, and no other exigent circumstances existed justifying his arrest.

233.   By knowingly and intentionally arresting Mr. Puente without consent, without probable cause, and without legal justification, Defendants Shimanek and Tomer deprived Mr. Puente of his Fourth Amendment right to be free from unreasonable seizures.

234.   As a result of the illegal arrest, Mr. Puente suffered injuries.

235.   As a result of the illegal arrest, Defendants Shimanek and Tomer deprived Mr. Puente of his civil, constitutional and statutory rights and are liable to Mr. Puente under 42 U.S.C. § 1983.

236.   Mr. Puente was damaged as a result of Defendants Shimanek and Tomer's wrongful acts as his liberty was deprived.

237.    Additionally, when making the illegal arrest, Defendants Shimanek and Tomer caused Mr. Puente physical pain and suffering when they sprayed his eyes and face with OC spray.

## Count Three

### Retaliatory Arrest
### Violation of the First Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendant Shimanek

238.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

239.    The First Amendment protects the right to record the police, subject to reasonable time, place, and manner restrictions. *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017).

240.    As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in constitutionally protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

241.    If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

242.    To prevail on a First Amendment retaliation claim, however, plaintiffs must plead and prove the absence of probable cause. *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020).

243.    The Supreme Court has recognized a "narrow" exception to this rule where the "plaintiff presents objective evidence that he was arrested [and that] otherwise

similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*; quoting *Nieves*, 139 S. Ct. at 1727.

244.    In this case, Neither Defendant Shimanek nor Defendant Tomer had probable cause that Mr. Puente had committed a crime at the time that Defendant Shimanek directed Defendant Tomer to arrest Mr. Puente, as Mr. Puente had not been obstructing the roadway since his truck was parked inches from the curb allowing pedestrian or vehicular traffic to pass freely, had complied with the order to move his truck, had not interfered with the investigation by any way other than speech, and was simply filming the police interaction in silence from the public sidewalk across the street.

245.    Due to a lack of probable cause to arrest Mr. Puente, it is clear that the grounds for Defendant Shimanek directing Defendant Tomer to arrest him was purely retaliatory for Mr. Puente filming Defendant Shimanek's racially motivated investigation of Dillon.

246.    Additionally, there is objective evidence that Mr. Puente was arrested when otherwise similarly situated individuals would not have been, as the white male that approached the scene refused to comply with Defendant Shimanek's and Defendant Tomer's repeated orders to move back and even defiantly talked back to them; however, neither Defendant arrested him nor even threatened to arrest him.

247.    It is clear that Defendant Shimanek subjecting Mr. Puente to a retaliatory arrest for engaging in the constitutionally protected conduct of filming the police is a violation of Mr. Puente's First Amendment rights. *Hartman*, 547 U.S. at 256; *Turner*, 848 F.3d at 688.

248.    Mr. Puente suffered loss of liberty, mental anguish, and physical injuries as a result of this retaliatory arrest.

## Count Four

### Deliberate Indifference
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Against Defendants Shimanek and Tomer

249.    A pretrial detainee alleging deliberate indifference must show that "(1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)).

250.    An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

251.    Moreover, deliberate indifference cannot be inferred from "negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.,* 245 F.3d 447, 458-59 (5th Cir. 2001).

252.    Rather, deliberate indifference is shown when a plaintiff properly alleges that officials "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino*, 239 F.3d at 756 (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).

253.    A serious medical need is one for which treatment has been recommended or for which <u>the need is so apparent that even laymen would recognize that care is required</u>. (emphasis added) *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006).

254.    The requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. *Farmer v. Brennan*, 511 U.S. 825, 842, 114 S. Ct. 1970, 1981, 128 L. Ed. 2d 811 (1994).

<u>Defendants Shimanek and Tomer were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.</u>

255.    Both Defendants were present when Defendant Tomer sprayed Mr. Puente in the face and eyes with OC spray.

256.    Both Defendants were present when Defendant Shimanek restrained Mr. Puente's hands behind his back in handcuffs making it so that Mr. Puente could not clean his face or eyes on his own.

257.    Both Defendants were aware that Mr. Puente could not clean his face or eyes on his own.

258.    Both Defendants were aware that OC spray caused the face and eyes to burn as Defendant Tomer stated "it's going to burn" and Defendant Shimanek used a towel and water to rinse the OC spray off his skin because it was burning.

259.    The need to remove the OC spray from Mr. Puente's eyes was so apparent that even laymen would recognize that care is required.

260.    Thus, both Defendants Shimanek and Tomer were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

<u>Defendants Shimanek and Tomer actually drew that inference.</u>

261.    Following Mr. Puente's requests for help, Defendant Shimanek responded, "we will get you medics in just a second," which along with the facts that Defendant Shimanek directed Defendant Tomer to spray Mr. Puente with OC spray, was present when Defendant Tomer sprayed Mr. Puente with the OC spray, and understood the pain it caused as he needed to use a towel and water to wipe and rinse the OC spray off himself to alleviate the burning, indicates that Defendant Shimanek actually drew the inference

that a substantial risk of serious harm existed and Mr. Puente was in need of immediate medical care.

262.    In response to Mr. Puente's requests for help, Defendant Tomer requested medics over the radio, which along with the fact that Defendant Tomer sprayed Mr. Puente with the OC spray, stated multiple times that he knew it was burning, and requested a towel from Defendant Shimanek to wipe the OC spray from Mr. Puente's face and eyes, indicates that Defendant Tomer actually drew the inference that a substantial risk of serious harm existed and Mr. Puente was in need of immediate medical care.

Defendants Shimanek and Tomer provided no medical attention

263.    Despite being aware of facts that would give rise to the inference that a substantial risk of serious harm existed and Mr. Puente was in need of immediate medical care, and both of the Defendants actually drawing that inference, neither Defendant provided medical attention.

264.    Instead of providing medical care, Defendant Shimanek refused to provide a towel to Defendant Tomer so that he could wipe Mr. Puente's eyes and then Defendant Shimanek instructed Defendant Tomer to bypass the medical care which was already in route from Defendant Tomer's request over the radio and instead to take Mr. Puente directly to the jail knowingly and intentionally delaying medical care for Mr. Puente.

265.    Instead of providing medical care, Defendant Tomer drove Mr. Puente to the jail, stopping on the way to adjust his seatbelt, and left him screaming for help in the backseat of his patrol vehicle for over seven minutes all knowingly and intentionally delaying medical care for Mr. Puente.

## V.
## PUNITIVE DAMAGES

266.    Mr. Puente repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

267.    When viewed objectively from the standpoint of Defendants Shimanek and Tomer, at the time of the occurrence, said Defendants' conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

268.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants Shimanek and Tomer which was recklessly or callously indifferent to Mr. Puente's constitutionally protected rights, Mr. Puente is entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

269.    Mr. Puente repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

270.    Mr. Puente's injuries were a foreseeable event.

271.    Mr. Puente's injuries were directly and proximately caused by the illegal and retaliatory arrest of, the excessive force used against, and the deliberate indifference shown toward, Mr. Puente.

272.    As a result, Mr. Puente is entitled to recover all actual damages allowed by law. Mr. Puente contends each of the Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Mr. Puente's federally protected rights. Thus, Mr. Puente is entitled to punitive damages against Defendants Shimanek and Tomer.

273.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Mr. Puente was forced to suffer:

    a. Emotional distress, torment, and mental anguish;
    b. Physical injuries;
    c. Physical pain and suffering;
    d. Permanent physical disfigurement; and
    e. Deprivations of his liberty.

274.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

**VII.**
**ATTORNEY'S FEES**

275.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. § 1988.

**VIII.**
**JURY REQUEST**

276.    Plaintiff respectfully requests a jury trial.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which he may show himself justly entitled.

Respectfully submitted,

/s/ *Scott H. Palmer*
SCOTT H. PALMER
Texas Bar No. 00797196
JAMES P. ROBERTS
Texas Bar No. 24105721
Colorado Bar No. 46582

SCOTT H. PALMER, P.C.
15455 Dallas Parkway,
Suite 540, LB 32
Dallas, Texas 75001

Tel: (214) 987-4100
Fax: (214) 922-9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

ATTORNEYS FOR PLAINTIFF